UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Docket No. 18-CR-10391-RGS |
| | ) | |
| DEREK SHEEHAN, | ) | |
| | ) | |
| Defendant. | ) | |

---

GOVERNMENT'S OMNIBUS RESPONSE TO THE DEFENDANT'S MOTIONS
TO SUPPRESS EVIDENCE AND FOR <u>FRANKS</u> HEARING

---

Now comes the United States, by and through the undersigned Assistant United States Attorney, and hereby files its omnibus opposition to the defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrants and Motion for a <u>Franks</u> Hearing. For the reasons discussed in greater detail below, this Court should DENY the motions.

## BACKGROUND AND RELEVANT FACTS

Derek Sheehan (the "defendant") stands charged by indictment in the above-captioned docket with three counts of sexual exploitation of children, in violation of 18 U.S.C. §§ 2251(a) and (e). Count One involves a minor victim identified as "Minor A," Count Two involves a minor victim identified as "Minor B," and Count Three involves a minor victim identified as "Minor C." [Doc. 13]. The investigation precipitating these federal charges stemmed from a separate investigation that began on or around June 28, 2018, when Minor A reported that he was the victim of a past sexual assault by the defendant to the Norwell Police Department. [Search Warrant Affidavit of Special Agent Lisa Crandall ("Crandall Aff.") at ¶ 4, attached hereto as Sealed Exhibit A]. As outlined in more detail below, the ensuing state investigation led to the execution of a state search warrant, issued by and docketed in the Hingham District Court as 1858SW0035, on August

1

17, 2018.  [Crandall Aff. ¶ 6].  On that same date, the defendant was arrested by the Massachusetts State Police for indecent assault and battery on a child under 14, in violation of M.G.L. c. 265, § 13B.  Id.

In the course of the execution of that state search warrant, investigators seized several electronic devices, including the defendant's cell phone.  [Doc. 3 ¶¶ 5-6].  During subsequent forensic examination of the phone, the forensic analyst observed photographs containing what he believed to be child pornography, and the Norwell Police therefore sought and obtained a second search warrant, issued by and docketed in the Hingham District Court as 1858SW0036, which allowed investigators to search the items seized pursuant to the first warrant for evidence of child pornography violations.  [Doc. 3 ¶ 6].  When investigators executed that search, they observed video evidence of the defendant sexually abusing various children while they apparently slept in his home.  Based on this video evidence, the defendant was subsequently charged in federal court with the sexual exploitation of children.  [Docs. 3, 13].

I.      **The first warrant – 1858SW0035**

On August 16, 2018, Norwell Police Officer Kayla Puricelli ("Puricelli") sought a warrant to search the residence of the defendant and his wife, Nichole Sheehan, located at 1 Spring Brook Drive, Norwell, MA for evidence of Impersonation of a Police Officer, Witness Interference and Obstruction of Justice, Unauthorized Access to a Computer, and Identity Fraud.  [SW35, attached hereto as Exhibit B].[1]  Puricelli included a particularized description of the items to be searched for and seized in the body of her application and affidavit [SW35 Aff. ¶ 3] and in a separate four-page attachment [SW35 Att. 1].

---

[1]   Citation to the first search warrant, 1858SW0035, will be "SW35," with specific reference to the warrant, application, affidavit, and attachments where appropriate.  It is appended hereto as Sealed Exhibit B.

In the affidavit submitted in support of the application, Puricelli outlined facts learned during the investigation that were sufficient to establish probable cause for the search warrant. [SW35 Aff. ¶ 4(b)].  Those facts are summarized as follows:

### A.    Review of Minor A's iPhone

On June 28, 2018, Puricelli received Minor A's iPhone from his sister, who had come to the Norwell Police Station to report the sexual assault.  [SW35 Aff. ¶ 4(c)(1)].  Minor A's sister reported to Puricelli that when she had reviewed Minor A's phone, she had observed references to a State Police file and an email exchange between the defendant and a person she believed to be the school resource officer, Rick Phelps, based on the email address involved in the exchange.  Id.

### B.    The State Police report

Puricelli spoke with multiple individuals who had some knowledge of a document that appeared to be a Massachusetts State Police report.  Those portions of the affidavit are outlined as follows:

### 1.    Minor B's family:[2] Paragraph 4(c)(6)

Minor B's mother spoke with investigators on August 1, 2018.  During that interview, she reported that the defendant had told her that the State Police had investigated him based on allegations that he was a pedophile, and that he had been "cleared."  The defendant had shown her the report on several occasions at his home, the first time being earlier that summer before the end of the school year, and made her read it.  Minor B's mother also read the report with the defendant's

---

[2]  In his motion for a Franks hearing, the defendant appears to have appointed the pseudonym "Minor B" to a child who was interviewed as a potential witness to the crimes being investigated at the state level; Count 2 of the federal indictment, charging the defendant with the sexual exploitation of Minor B, refers to a *different* child.  For the purposes of the litigation of this motion only, the government adopts the defendant's naming convention to refer to the potential witnesses to the state crimes.

wife.  She described the tabbed report as consisting of hundreds of pages and bearing a State Police emblem on its cover, and indicated that it contained some of her son's text messages with another child referenced herein as Minor C.

### 2.     Minor C's family: Paragraph 4(c)(10)[3]

Minor C's mother met with investigators on August 14, 2018.  She relayed that the defendant had texted her husband in April 2018 to meet, and that during that meeting, the defendant brought a State Police report, which contained several printouts of text messages.

### 3.     Minor D's family: Paragraph 4(c)(7)[4]

Minor D's father met with investigators on August 1, 2018.  During that meeting, he informed them that he was aware of the report but had only seen a picture of it, which showed it to be tabbed and bear the State Police emblem on its cover.[5]  He explained that the defendant told him that kids were texting in school and a comment that "Mr. Sheehan loves me" got "flagged" on the school's WiFi, that school administration and Officer Phelps were alerted, and that Phelps had in turn alerted the defendant to the ongoing investigation.  Minor D's father understood that the defendant was subsequently "cleared" of all wrongdoing.

---

[3]   The child referred to as Minor C for the purposes of the litigation of the defendant's motion to suppress is *not* the child referenced in Count 3 of the federal indictment.

[4]   The child referred to as Minor D for the purposes of the litigation of the defendant's motion to suppress was later determined to be a victim depicted in the videos that show the defendant sexually abusing boys in his home.  He is referenced in Count 2 of the federal indictment as "Minor B."

[5]   Minor D's father forwarded the photograph to investigators.  The defendant has appended it to his motion for a Franks hearing.

### 4.      Nichole Sheehan: Paragraph 4(c)(9)

On August 1, 2018, investigators visited the defendant's wife at her home.  They asked her about the State Police report, and she claimed she had never seen it or anything that looked like a police report.  When investigators informed her that her husband had never, in fact, been previously investigated by the police, she bit her lip, appeared as if she were going to cry, and refused to continue speaking with them.

### C.      Minor A's Apple ID

Puricelli also included information in the affidavit from various potential witnesses about the defendant's alleged access to Minor A's Apple account.  On August 7, 2018,[6] investigators interviewed Minor B.  [SW35 Aff. ¶ 4(c)(11).]  He told them that because the defendant had helped Minor A create his Apple ID "a while ago," the defendant still had access to Minor A's texts, pictures, and videos through the account.  Id.  Minor B indicated that the defendant frequently used the computer in his office to look at Minor A's text conversations, and that he had seen the defendant access Minor A's text conversations with his parents when Minor A wasn't there.  Id. Minor B characterized the defendant as "spying" on Minor A's texts without Minor A's permission.  Id.  He further indicated that the defendant had a "bunch" of laptops in his home, a black iPhone, an iPad, and a server in his basement.  Id.

Following the August 14, 2018 interview of Minor C's mother, investigators spoke with Minor C.  [SW35 Aff. ¶ 4(c)(10).]  Minor C informed them that the defendant had made Minor A's Apple ID account for him, and thus had Minor A's Apple ID and password.  Id.  Minor C also

---

[6]   The government agrees with the defendant that, given the date of the first warrant application, Puricelli's reference to this interview as occurring on August 17 is likely a typo meant to read "August 7."

told investigators that in text messages between Minor A and Minor C around January 2018, the defendant was referred to as a "literal child rpst."  Id.

As part of the investigation, Massachusetts State Trooper Donovan provided Puricelli with information obtained from Google.  [SW35 Aff. ¶ 4(c)(14).]  That information included subscriber information for an email account that contained Minor A's name, with the recovery email set as Minor A's first name @dgs.me, which investigators knew to be an address associated with the defendant's emails.  Id.  The phone number included in the subscriber information for that email account was the defendant's phone number.  Id.

**D.      The Phelps email account**

Trooper Donovan also provided Puricelli with subscriber information for the email account "rickphelps21@gmail.com."  [SW35 Aff. ¶ 4(c)(14).]  Included as part of that subscriber information was documentation of the IP address used to create the Gmail address on April 14, 2018.  Id.  That IP address, 71.184.91.173, was registered on that date (and thereafter) to the defendant at his home address.  Id.

In a meeting on June 28, 2018, Minor C's mother informed Puricelli that while she was looking through her son's phone, she observed a screen shot of an apparent email exchange between the defendant and a "Rick Phelps," who she believed to be the school resource officer. [SW35 Aff. ¶ 4(c)(2).]

In a conversation on June 30, 2018, Minor A's father informed Puricelli that, months earlier, the defendant had sent him a copy of an email exchange between the defendant and Officer Rick Phelps about an investigation into text messages between Minor A and Minor C.  [SW35 Aff. ¶ 4(c)(3).]  The defendant told Minor A's father that Minor A had called the defendant a

"pedophile" in a message to Minor C, that the school WiFi had flagged it, and the issue had been resolved.  Id.  Minor A's father understood Phelps to be the school resource officer.  Id.

      **E.**     **Witness intimidation**

Apart from the information outlined above regarding the Phelps email account and the State Police report, Puricelli's affidavit discussed further facts relevant to a potential witness intimidation charge.

On August 16, 2018, Minor B's mother informed Puricelli that on August 13, 2018, the defendant and Mrs. Sheehan "begged her" to call them.  [SW35 Aff. ¶ 4(c)(12)].  She did; Nichole Sheehan informed Minor A's mother that the police were investigating the defendant based on allegations of assault by Minor A the previous summer on the Cape, and the police were trying to turn her against her husband.  Id.  Nichole Sheehan told Minor B's mother that the police were lying and not to believe them.  Id.  Minor B's mother reported that during the conversation, the defendant got on the phone and told her that Detective Dooley was playing games, that the police would be talking to her (if they hadn't already), and that she should "go ahead and tell them that I've done nothing wrong."  Id.

## II.    The second warrant – 1858SW0036

On August 29, 2018, Puricelli applied for a second search warrant, issued by and docketed in the Hingham District Court as 1858SW0036, to search the electronic devices seized pursuant to the first warrant for evidence related to the possession of child pornography, committed in violation of M.G.L c. 272, § 29(C).[7]  Puricelli included a particularized description of the items to be searched for and seized both in the body of the application and affidavit [SW36 Aff. ¶ 3] and

---

[7]   Citation to the second search warrant, 1858SW0036, will be "SW36," with specific reference to the warrant, application, affidavit, and attachments where appropriate.  It is appended hereto as Sealed Exhibit C.

in a separate one page attachment [SW36 Att. 1].  In the affidavit submitted in support of the search warrant, Puricelli explained that, during his review of the defendant's phone during the execution of the first warrant, Massachusetts State Police Trooper Hart observed pictures he believed depicted child pornography.  [SW36 Aff. ¶ 4(b)(3).]  Specifically, he described the pictures as consisting of images of prepubescent penises that lacked pubic hair.  Id.

## DISCUSSION

### I.   The Defendant's Motion to Suppress Evidence Must be Denied.

In his Motion to Suppress, the defendant sets forth several grounds on which he urges this Court to suppress the video evidence that depicts him sexually assaulting young boys in his home. Specifically, he contends that: 1) the first search warrant lacked probable cause to believe that the defendant committed any crime and that fruits of those crimes would be found at his home; 2) the first warrant was unconstitutionally overbroad; 3) the seizure of the defendant's iPhone from his wife was not authorized by the first warrant; 4) the search executed pursuant to the first warrant was executed overbroadly; and 5) the second search warrant lacked probable cause.  For all of the reasons that follow, each of these arguments fails, and the motion to suppress must be denied.

### A.   The affidavit established probable cause to believe that a crime had been committed and that evidence, fruits, and instrumentalities of that crime would be located at the defendant's residence.

Probable cause for a search warrant exists "where information in the affidavit reveals a fair probability that contraband or evidence of a crime will be found in a particular place."  United States v. Syphers, 426 F.3d 461, 464 (1st Cir. 2005) (internal quotations omitted).  Courts reviewing the sufficiency of an affidavit engage in a totality of the circumstances analysis, considering affidavits "in a common sense manner."  Syphers, 426 F.3d at 465 (internal quotations omitted).  Based on the totality of the information included in the affidavit, there was probable

cause to believe that the defendant had violated each of the statutes enumerated below, and that evidence, fruits, and instrumentalities of those crimes would be found in his home.

### 1.  Impersonation of a Police Officer, M.G.L. c. 268, § 33

Massachusetts General Laws, Chapter 268, Section 33 provides, in pertinent part:

> Whoever falsely assumes or pretends to be a ... police officer … and acts as such or requires a person to aid or assist him in a matter pertaining to the duty of such officer, shall be punished …

Massachusetts courts have had few opportunities to examine the application of this provision, but given the plain language of the statute, have interpreted the government's burden to include proof "not only that the defendant impersonated an officer, but also that he took some action in keeping with the pretense."  Commonwealth v. Widberg, 88 Mass. App. Ct. 1102 at *1 (2015) (unpublished).[8]

The defendant claims that the affidavit supporting the first warrant lacked probable cause because it does not allege that the defendant used the title or authority of the police to accomplish something.  [D.Mot. at 8].  This argument misses the mark; it is not only factually inaccurate, but it also imposes a burden of proof on the government that is rooted neither in statute nor common law.

Here, the affidavit lays out a scheme by which the defendant attempted to divert attention from himself as the target of a *real* investigation by assuming the identity of Norwell Police Officer Rick Phelps.  Central to the scheme was the defendant's creation of an email address in the officer's name, which he used to impersonate the *real* Phelps in a fake conversation over email with himself. A fair reading of the facts outlined in Puricelli's affidavit leads to the conclusion that the defendant

---

[8]  The government is unaware of any published case that directly addresses the elements of or the sufficiency of evidence supporting a conviction for a violation of the statute.

fabricated the Massachusetts State Police report to help pull off the ruse. He showed the fraudulent email conversations and report to multiple individuals who had some stake in the matter—such as Minor A's parents and Minor C's parents—and talked about it to others.

These facts certainly establish probable cause to believe that the defendant falsely impersonated an officer and "act[ed] as such." M.G.L. c. 268, § 33. Contrary to the defendant's suggestion, [D.Mot. at 9], the government need not show that he "used the title of a police officer and [took] official action consistent with his use of that title" to sustain its burden. See, e.g., United States v. Martindale, 790 F.2d 1129, 1135 (4th Cir. 1986) (defendant charged with impersonating federal officer in violation of 18 U.S.C. § 912 "acted as such" by using diplomatic passport to register at hotels and receive rental car discount); [9] United States v. Willis, 527 Fed. App'x 376, 378 (6th Cir. 2013) (sufficient evidence that defendants charged with impersonating federal officers under 18 U.S.C. § 912 "acted as such," where they provided a printing company with document bearing Dept. of Defense watermark); United States v. Gilbert, 143 F.3d 397, 398-399 (8th Cir. 1998) (defendant charged with impersonating federal officer in violation of § 912 "acted as such" by displaying U.S. Customs badge and identification card when pulled over for speeding).

Here, the defendant concedes that he "engage[d] in the pretense of being a person named Rick Phelps." [D.Mot. at 9.] The fact that he didn't use an "official" Norwell Police Department email account is irrelevant to the analysis. Under the totality of the circumstances, the warrant established "a fair probability" that evidence, fruits, and instrumentalities of violations of

---

[9] The Massachusetts statute tracks the language of the federal statute, which provides in pertinent part: "Whoever falsely assumes or pretends to be an officer or employee acting under authority of the United States or any department, agency or officer thereof, and acts as such…" shall be punished. 18 U.S.C. § 912.

impersonation of a police officer would be found at the defendant's residence.  Syphers at 464.

There was no error.

### 2.  Witness Intimidation, M.G.L. c. 268, § 13B

Massachusetts General Laws, Chapter 268, Section 13B provides, in pertinent part:

> Whoever willfully, either directly or indirectly: (i) threatens … or (iii) misleads, intimidates, or harasses another person who is a (A) witness or potential witness; (B) person who is or was aware of information, records, documents or objects that relate to a violation of a criminal law … with the intent to or with reckless disregard for the fact that it may: (1) impede, obstruct, delay, prevent or otherwise interfere with: a criminal investigation at any stage … shall be punished.[10]

G.L. c. 268, § 13B(b) (St. 2018, c. 69, § 155, eff. April 13, 2018).  The statute does not require, as

the defendant contends, that he intended to interfere with an "ongoing proceeding," [D.Mot. at 11-

12], or that he did so with "any expression of malice."  [D.Mot. at 13.]

Here, the conduct outlined in the affidavit falls squarely within the scope of the statute.

The defendant fabricated the State Police report for the sole purpose of diverting investigatory

focus from himself once he realized (by gaining unauthorized access to Minor A's text messages)

that Minor A and his friends might be talking about his alleged assault of Minor A.  He then

circulated that fraudulent report—along with a fabricated chain of emails that he concocted—to

make it seem as if "rumors" about him were investigated and cleared.  The only conceivable reason

for doing so is to mislead potential witnesses from the truth, to prevent a real investigation from

uncovering his illegal conduct.  Just a few months after the defendant engaged in those preliminary

efforts, the defendant apparently realized that his plan had failed.  The fair inference is that then,

---

[10] The version of the statute in effect from November 4, 2010 to April 2, 2018 does not differ from the current version of the statute in any way that is material to this analysis.  The government notes, however, that certain of the cases cited by the defendant interpret earlier versions of the statute that have been changed significantly by intervening amendments.  See, e.g., D.Mot. at 11 (citing Commonwealth v. Pagels, 69 Mass.App.Ct. 607, 612-613 (2007) (interpreting the 1996 version of the statute)).

his wife reached out to Minor B's mother, arguably on his behalf, to alert her that there was an active investigation targeting the defendant for crimes against one of her son's friends.  Nichole Sheehan told Minor B's mother that the police were lying, urged her not to believe them, and the defendant joined in – for the sole purpose of misleading the investigation.

As an initial matter, there is no question that Minor B's mother and the other parents who the defendant targeted with this elaborate scheme were "potential witnesses" as contemplated by the statute.  Commonwealth v. Fragata, 480 Mass 121, 126 (2018)  (in analyzing 2010 version of statute, noting that "'potential witness at any stage of a criminal investigation' includes persons who are likely to participate in a future investigation that has not yet begun").  The defendant's reliance on Commonwealth v. Hamilton, 459 Mass. 422 (2011), Commonwealth v. Patch, 91 Mass. App. Ct. 1122 (2017) (unpublished), and Commonwealth v. Burt, 40 Mass. App. Ct. 275 (1996), is misplaced; those cases all interpret earlier versions of the statute, which are not relevant here.  Hamilton and Patch are particularly inapposite, where they outline the statute's application to retaliatory conduct.

Similarly, the defendant's reading of "witness" as it is contemplated by the statute is too constricted; he dismisses the applicability of § 13B because there was "no possibility that [the people the defendant showed the report and emails to] would be called to testify against him about the assault on Minor A." [D.Mot. at 12.]  The defendant's analysis on this point fails, however.  A "witness" isn't defined by just potential *testimony*; the statute protects any "person who is a: (A) witness or potential witness; [or] (B) person who is or was aware of information, records, documents or objects that relate to a violation of a criminal law."  M.G.L. c. 268, § 13B(b).

Moreover, there is no requirement, as the defendant suggests, that the government demonstrate "an expression of menace to the alleged victim's person or property."  [D.Mot. at 13.]

12

In fact, the Supreme Judicial Court has long held to the contrary.  See, e.g., Commonwealth v. Robinson, 444 Mass. 102, 109 (2005) (citing Commonwealth v. Gordon, 44 Mass. App. Ct. 233 (1998) for proposition that defendant's behavior can still qualify as intimidation even if not overtly threatening).  All of the cases the defendant cites in support of this contention predate the significant overhauling of the statutory text in intervening years.  *Now*, a defendant brings himself within the scope of the statute when he "threatens," "misleads," "intimidates," or "harasses" one of the people protected by the statute.  M.G.L. c. 268, § 13B(b).

While the "misleading" prong is typically charged in connection with a "police officer" as its target, its application has not actually been expressly limited by statute or common law.  The Supreme Judicial Court has noted that, given Massachusetts courts' construction of the statute as it has evolved over the years and in light of the underlying statutory purpose, "it seems evident that whether a statement is 'misleading' for purposes of § 13B depends on whether it reasonably could lead investigators to pursue a course of investigation materially different from the course they would have otherwise pursued." Commonwealth v. Paquette, 475 Mass. 793, 801-802 (2016). Nonverbal conduct may also satisfy this prong of the statute, when "it was intended to create a false impression in the mind of another and, if so, whether such conduct was reasonably likely to lead the investigation in a materially different, or wrong, direction." Commonwealth v. Tejeda, 476 Mass. 817, 819-820 (2017).

Here, the defendant's impersonation of Officer Phelps in an imaginary email chain; fabrication of the State Police report; presentation of both to multiple parents who, if allegations involving Minor A came to light, would certainly be potential witnesses or at least aware of information relevant to a violation of a criminal law; statements to those parents that he had been "cleared" of supposed wrongdoing; and efforts to convince Minor B's mother to tell the police that

he had "done nothing wrong" all demonstrate an elaborate and well-thought out attempt to steer investigators toward a "course of investigation materially different from the course they would have otherwise pursued."  Paquette, 475 Mass. at 801-802.  Under the totality of the circumstances, Puricelli's affidavit established a fair probability that evidence of violations of M.G.L. c. 268, § 13B would be found in the defendant's residence.

### 3.   Unauthorized Access to a Computer, M.G.L. c. 266, § 120F

M.G.L. c. 266, § 120F provides, in pertinent part:

> Whoever, without authorization, knowingly accesses a computer system by any means, or after gaining access to a computer system by any means knows that such access is not authorized and fails to terminate such access, shall be punished…

> The requirement of a password or other authentication to gain access shall constitute notice that access is limited to authorized users.

There is a dearth of case law interpreting this provision.  A plain reading of the statute, however, shows that the affidavit contained sufficient facts to establish probable cause that evidence of a violation would be found in the place to be searched.

The affidavit established that Minor A had an Apple account that was password-protected, that the defendant logged into that account without Minor A's knowledge or consent, and that he did so using computer devices from his home.  The defendant was not authorized to access Minor A's account.  See, e.g., Commonwealth v. Piersall, 67 Mass. App. Ct. 246 (2006) (defendant liable under statute for accessing ex-wife's email account with password gleaned from minor daughter).

The defendant's argument to the contrary is unavailing.  [D.Mot. at 15.]  Regardless of whether Minor A realized that the defendant had his login information, the defendant was not authorized to access his account, which is plainly obvious given the purpose for which witnesses accused him of doing so: to spy on Minor A.  The defendant was therefore potentially liable under the statute.  See, e.g., Cheng v. Romo, 2012 WL 6021369 at *3-4 (D.Mass. 2012) (in denying

14

motion for summary judgment of civil complaint for violation of analogous provision of Stored Communications Act, noting that whether plaintiff gave defendant password was not determinative in evaluating whether defendant was authorized or exceeded authorization to access plaintiff's email account).   The affidavit established probable cause to believe the statute had been violated and that evidence of said violation would be found in the defendant's home.

### 4.   Identity Fraud, M.G.L. c. 266, § 37E

M.G.L. c. 266, § 37E provides, in pertinent part:

(b) Whoever with intent to defraud, poses as another person without the express authorization of that person and uses such person's personal identifying information to obtain or attempt to obtain … anything of value, … or to harass another…shall be guilty of identity fraud[.]"

When the defendant posed as Officer Rick Phelps, as outlined above, he did so specifically to avoid prosecution (or, at least, scrutiny from law enforcement).[11]   A common sense reading of the statute supports the argument that attaining that goal would surely qualify as something of value.

However, less than five months before Puricelli submitted her affidavit to the clerk magistrate, the Supreme Judicial Court rejected the government's argument that "anything of value" could refer to intangible benefits in  Commonwealth v. Escobar, 479 Mass. 225 (2018) (providing false name to police officer to avoid prosecution did not involve attempt to obtain "anything of value").   The government concedes that this new case law addresses the issue raised by the defendant here, and resolves it in the defendant's favor.   But, neither Puricelli nor the clerk

---

[11]   The defendant's plan was convoluted; he fabricated the emails and State Police report to convince the parents in his orbit that he had *already been* investigated and cleared so that, if Minor A or one of his friends *did* disclose his *true* crime, the parents would mistakenly believe that it had already been dealt with, and would thus be discouraged from sharing information with the police.

magistrate who issued the warrant should be faulted for finding probable cause to believe the defendant's misappropriation of Officer Rick Phelps's identity in order to avoid law enforcement scrutiny for crimes he was accused of committing against Minor A brought him within the scope of the statute.  Just over one year earlier, a panel of the Massachusetts Appeals Court ruled that a defendant who presented a stolen license to an officer who pulled her over for speeding was properly prosecuted under the statute because her "ability to drive despite her license being suspended certainly qualifies as something of value."  Commonwealth v. Ney, 91 Mass. App. Ct. 1107 at *2 (2017) (unpublished).  Where an objectively reasonable officer would not necessarily have been aware of this new (March 2018) case in August 2018, suppression would have no deterrent effect and thus is not warranted.  United States v. Brunette, 256 F.3d 14, 20 (1st Cir. 2001) (applying Leon good-faith exception where law unsettled).

> **5.  Even if the affidavit did not supply probable cause, the Leon good-faith exception applies.**

Even if this Court finds that the clerk magistrate erred in issuing the search warrant, on any or all of the bases described above, the defendant's motion to suppress must be denied because the officers executing the warrant acted in objectively reasonable reliance on it.  Supreme Court precedent dictates that suppression is a remedy of last resort, to be used for the sole purpose of deterring future Fourth Amendment violations, and only when the deterrence benefits of suppression outweigh its heavy costs. Davis v. United States, 564 U.S. 229, 237 (2011); Herring v. United States, 555 U.S. 135, 140-41 (2009). "The fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." Id. (citing Illinois v. Gates, 462 U.S. 213, 223 (1983)). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully

deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."

Herring, 555 U.S. at 144.

These principles are reflected in the good-faith exception to the exclusionary rule articulated in Leon: when police act in "objectively reasonable reliance on a subsequently invalidated search warrant" obtained from a neutral and detached magistrate, "the marginal or nonexistent benefits produced by suppressing evidence . . . cannot justify the substantial costs of exclusion." United States v. Leon, 468 U.S. 897, 922 (1984). The good-faith exception thus recognizes that, "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope . . . there is no police illegality and thus nothing to deter." Id. at 920-21.

The good-faith exception cannot apply in certain clearly-delineated situations: where the issuing judge was misled by information in the affidavit; where the issuing judge wholly abandoned his judicial role; where the warrant affidavit is so lacking in probable cause "as to render belief in its existence entirely unreasonable;" and where the warrant fails to identify with particularity the place to be searched or things to be seized so that agents could not reasonably presume it to be valid. United States v. Levin, 874 F.3d 316, 322 (1st Cir. 2017) (citing Leon at 923 and United States v. Woodbury, 511 F.3d 93, 99 (1st Cir. 2007)).

Here, none of these four exclusions to the good-faith exception apply. As discussed in more detail below, Puricelli did not mislead the clerk magistrate, there is nothing in the record to suggest that the clerk magistrate "wholly abandoned" his role in issuing the warrant, and the warrant was exceedingly particular in identifying the place to be searched and the things to be seized. Furthermore, for the reasons outlined above, the warrant did *not* lack probable cause. Puricelli and her colleagues acted in objective good faith in obtaining the search warrant and acted

within its scope, and there is no illegal behavior to deter.  Leon, 468 U.S. at 920-921.  The motion must therefore be denied.

**B.      The first warrant was not unconstitutionally overbroad.**

The defendant advances several arguments to support his complaint that the first warrant was unconstitutionally overbroad.  First, he contends that the search for "every media or electronic device, whether or not it was capable of generating or storing the items sought in the search" and "regardless of ownership" rendered the warrant invalid.  [D.Mot. at 18.]  He also argues that the warrant sought devices without offering proof that the defendant actually owned them.  [D.Mot. at 22.]

"General warrants authorizing the wholesale rummaging through a person's property are invalid."  United States v. Kuc, 737 F.3d 129, 133 (1st Cir. 2013) (internal citations omitted).  "To satisfy the particularity requirement, a search warrant 1) must include sufficient information to guide and control the judgment of the executing officer in deciding where to search and what to seize and 2) cannot be overbroad or include items that should not be seized."  Id.  The search and seizure conducted under a warrant must conform to the warrant.  United States v. Upham, 168 F.3d 532, 536 (1st Cir. 1999).

The defendant concedes that the crimes referenced in the warrant could have involved the use of an email account, an Apple account, and the printing of a publicly available State Police logo.  [D.Mot. at 19.]  He fails to assert, however, how or why any of the items specifically enumerated in Attachment 1 to the first search warrant (appended hereto as Exhibit B) are not sufficiently particularized.  The attachment to the affidavit lists less than two pages' worth[12] of

---

[12] The actual attachment is four pages, but a significant portion is consumed by a recitation of the relevant state statutes.

specific items to be seized, many of which are related to the storage, manipulation, and sending of computer data (Items A, C, D, E, M,[13] N, O, P, Q, R, and S) – a category that, by the defendant's own concession, might contain evidence of the crimes laid out in the affidavit.  Despite the defendant's allegation to the contrary [D.Mot. at 22], the affidavit did, in fact, contain information that the defendant specifically owned many of these items.  [SW35 Aff. ¶ 4(c)(11).]  The clerk magistrate who issued the warrant need not have "presumed" that he owned such things.  The affidavit explicitly indicated that he did.

Furthermore, the attachment to the affidavit identifies not only the types of items to be seized, but also the types of files to be searched for in those items.  Contrary to the defendant's claim, this was not styled as a "general warrant."  [D.Mot. at 20.]  For example, Item M seeks permission to search various types of files "relevant to the report of" each of the asserted crimes at issue.  [SW35 Att. 1.]  Items M through S are further specifically tied to "the aforementioned violations of Massachusetts General Law which are under investigation."  Id.  The warrant is sufficiently particularized to withstand constitutional scrutiny.  United States v. Kuc, 737 F.3d at 133-134.  A challenge to the particularity of the affidavit, under these circumstances, must fail. See, e.g., United States v. Carruthers, 2009 WL 4738186 at *5 (D.Mass. 2009) (warrant listing specific computer-related items capable of storing, manipulating, and sending data not lacking in particularity).

To the extent the warrant is flawed in the way the defendant claims it to be, blanket suppression is not the answer.  United States v. Riggs, 690 F.2d 298, 300-301 (1st Cir. 1982).  For example, if the Court agrees with the defendant that the affidavit doesn't draw a sufficient nexus to "MP3 players" [D.Mot. at 22] or information about the Snapchat username "Dank Stank"

---

[13] "M" is used twice, on pages 2 and 3 of the attachment; both fit into this category of data.

[D.Mot. at 24], the Court should suppress any MP3 players seized.  Finally, even if this Court finds

that the language in the affidavit violated the particularity requirement of the Fourth Amendment,

the good-faith exception to the exclusionary rule would apply.  Kuc, 737 F.3d at 134.  The motion

to suppress, on these grounds, should be denied.

> **C.      The search was not executed overbroadly.**

The defendant next argues that the search was overbroadly executed, in that a phone was

seized from the person of Nichole Sheehan, in direct contravention to the face of the warrant, and

in that investigators opened files not pertaining to the crimes outlined in the first warrant.  [D.Mot.

at 25-26.]

As an initial matter, the first warrant return does not indicate the location from where the

defendant's iPhone was seized.  The return merely indicates that it was seized pursuant to the

warrant.  [SW35 Ret.]  The government is unclear as to the basis for the defendant's contention

that the phone was seized as part of a "warrantless search."  [D.Mot. at 25.] [14]

The defendant also argues that the affidavit did not supply a basis to believe that there

would be photographs or videos of an incriminatory nature, and therefore, the officers never should

have reviewed video media in executing the search warrant.  [D.Mot. at 26.]  This argument, it

appears, is really an extension of the argument made above – that the affidavit does not draw a

sufficient nexus between the type of file to be searched (videos) and the crimes for which the

affidavit established probable cause.  Styled as it is, however, it must fail. [15]  First, the affidavit

submitted in support of the second warrant indicated that a trooper conducting a forensic analysis

---

[14]  Rather than engage in a hypothetical analysis here, the government reserves argument on this
point for a hearing on the motions or, if it would be helpful to the Court, in a separate briefing.

[15]  To the extent the Court agrees that the affidavit did not draw a sufficient nexus to videos, the
good-faith exception applies, for the reasons outlined above.

of the defendant's phone pursuant to the first warrant observed *pictures* he believed to be child pornography.  This mistake of fact eviscerates the argument; the defendant does not suggest—nor could he, given the facts laid out in the affidavit regarding pictures of the Massachusetts State Police report—a deficient nexus between that type of media and the alleged crimes.  The warrant, authorized by a detached and neutral clerk magistrate, allowed officers to search for pictures or images.  In the absence of an allegation that the magistrate abandoned that detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit.  Leon, 468 U.S. at 926.  That is not the case here, and as such, the "extreme sanction of exclusion is inappropriate."  Id.

> **D.  The second warrant was properly issued, where it established probable cause to believe the specified items would contain evidence of child pornography.**

In executing the first warrant, Trooper Hart observed images on the defendant's phone that he believed to be child pornography.  [SW36 Aff. ¶ 4(b)(3).]  Relying on the First Circuit's decision in United States v. Brunette, 256 F. 3d 14 (1st Cir. 2001), the defendant argues that, because Puricelli did not submit copies of the child pornography that Trooper Hart observed, the affidavit lacks probable cause and the fruits of the warrant should be suppressed.  [D.Mot. at 30.]  If this were an affidavit submitted to a federal magistrate judge in the District of Massachusetts (or elsewhere in the First Circuit), the government might agree.  However, it was not; it was submitted to a clerk magistrate of a state district court.  As such, while the First Circuit's opinion in Brunette may be instructive, it is not binding precedent.  "Although we give respectful consideration to such lower Federal court decisions as seem persuasive, we are not bound by decisions of Federal courts except the decisions of the United States Supreme Court on questions of federal law." Commonwealth v. Pon, 469 Mass. 296, 308 (2014) (internal quotations omitted).  The government is unaware of any Supreme Court or Massachusetts state court case that adopts the "best practice"

outlined in <u>Brunette</u>.  As such, neither Puricelli nor the clerk magistrate who issued the second warrant should be held to its standard.

To establish probable cause, an affidavit need only establish a "fair probability" that evidence of particular crime will be found in particular locations.  <u>Commonwealth v. Anthony</u>, 451 Mass. 59, 72 (2008).  "An inference drawn from the affidavit, if not forbidden by some rule of law, need only be reasonable and possible…not necessary or inescapable."  <u>Commonwealth v. Molina</u>, 476 Mass. 388, 394 (2017) (internal quotations omitted).  Here, Puricelli's affidavit, when examined "in a common sense manner," <u>Syphers</u>, 426 F.3d at 465, establishes such a probability, where it indicates that Trooper Hart observed pictures of prepubescent penises lacking pubic hair. [SW36 Aff. ¶ 4(b)(3).]  The clerk magistrate thus properly issued the warrant to search the specified devices for further evidence of child pornography.

Once again, even if this Court determines that the affidavit lacked probable cause, the defendant's motion to suppress must be denied because the officers executing the warrant acted in objectively reasonable reliance on it and the good-faith exception applies.

## II.    <u>The defendant's motion for a *Franks* hearing must be denied.</u>

Affidavits executed in support of a search warrant enjoy a presumption of validity.  <u>Franks v. Delaware</u>, 438 U.S. 154, 171 (1978).  A defendant may be entitled to a hearing to contest the factual validity of an affidavit only if he makes a "substantial preliminary showing" on two issues. <u>Franks</u>, 438 U.S. at 170.  First, the defendant must make a showing of "deliberate falsehood or of reckless disregard for the truth" regarding specific portions of the warrant affidavit; "negligence or innocent mistake" will not suffice.  <u>Id.</u> at 171.  If the defendant alleges that the officer was reckless, the defendant must show that "the affiant in fact entertained serious doubts as to the truth of the allegations." <u>United States v. Ranney</u>, 298 F.3d 74, 78 (1st Cir. 2002) (internal quotations omitted).

Second, even if the defendant makes this showing, he is not entitled to a Franks hearing if, "when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause."  Id. at 171-72.  In other words, the defendant must show that the allegedly false statement was "necessary to the finding of probable cause."  United States v. Reiner, 500 F.3d 10, 14 (1st Cir. 2007) (quoting Franks, 438 U.S. at 155-56).

"A defendant's failure to make a showing on either of these two elements dooms his challenge."  United States v. Owens, 917 F.3d 26, 38 (1st Cir. 2019) (internal quotations omitted). If these two requirements are met, the defendant may then try to establish by a preponderance of the evidence that the search warrant affiant in fact committed perjury, and that the non-perjurious content of the search warrant affidavit would have been insufficient on its own to establish probable cause, thereby requiring that the search warrant be voided and its fruits suppressed. Franks, 438 U.S. at 156.

In announcing this rule, the Supreme Court emphasized that it "has a limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded."  Id. at 167.  The First Circuit has aptly characterized these requirements as "clear" and "exacting standards" that a defendant must satisfy to obtain a Franks hearing.  United States v. Higgins, 995 F.2d 1, 3 & n.3 (1st Cir. 1993).  Because these standards are so high, the First Circuit, more than 20 years after the Franks decision, specifically cited Franks and its requirement for a substantial preliminary showing when observing that "evidentiary hearings on motions in criminal cases are the exception, not the rule."  United States v. Alicea, 205 F.3d 480, 487 (1st Cir. 2000).

The Franks framework has been extended to the omission of material information from search warrant affidavits.  "In the case of an omission, 'suppression should be ordered only if the warrant application, . . . clarified by disclosure of previously withheld material, no longer demonstrates probable cause.'" United States v. Reiner, 500 F.3d 10, 14 (1st Cir. 2007)(quoting United States v. Stewart, 337 F.3d 103, 105 (1st Cir. 2003)) (alteration in original).  Thus, "the inquiry is whether [the omission's] inclusion in an affidavit would have led to a negative finding by the magistrate on probable cause." United States v. Castillo, 287 F.3d 21, 25 n.4 (1st Cir. 2002). The omission still must be intentional or reckless: "even if the facts omitted from the warrant application were material, either individually or in the aggregate, that determination alone does not suffice to show that a Franks violation occurred. 'Franks protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate.'" United States v. Belton, 414 F. Supp. 2d 101, 111 (D.N.H. 2006) (quoting United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990))(collecting cases), aff'd, 520 F.3d 80 (1st Cir. 2008).

Here, the defendant asserts three claims in support of his motion for a Franks hearing: 1) Puricelli included facts about an interview of Minor B in the affidavit that were not documented in a report of that interview; 2) Puricelli intentionally misled the clerk magistrate by omitting information about Minor A's knowledge regarding the defendant's access to Minor A's Apple account; and 3) Puricelli intentionally, or with reckless disregard for the truth, omitted a first-hand description of or picture of the State Police report.

The defendant has not made (and cannot make) the requisite substantial preliminary showing required for a hearing (much less prove that a Franks violation occurred) because he has failed to establish the intentionality and materiality of the alleged misstatement.  Furthermore, as

a matter of law, the alleged omissions do not rise to the requisite level of materiality (i.e., they cannot eviscerate the finding of probable cause) and there is no basis for concluding that any omission was designed to mislead or made in reckless disregard of whether it would mislead the reviewing clerk magistrate.

The defendant's claim that Puricelli "adds a number of more sinister facts that appear to not have actually been stated by Minor B," [D.Mot. at 6], is baseless.[16]  First, the Massachusetts State Police report indicates, in the first paragraph, that the troopers met with Puricelli and another Norwell Police detective, and that Minor B's mother consented to having all four officers present for the interview.  Def. Exh. C ¶ 1.  The defendant's claim that Puricelli was not present is, plainly, wrong.  Second, the trooper indicated in the report that the interview was recorded and that the report was a "brief summary of the interview."  Id.  The defendant's contention that the trooper "recited the facts as he heard them" is also, plainly, wrong.  The defendant has thus failed to demonstrate that his request to hold an evidentiary hearing "to determine where these additional facts came from" is based on a substantial showing of either intentionality or materiality, and his motion on this ground must fail.

The defendant's second basis similarly fails to justify his request for a Franks hearing.  The defendant speculates that "reasonable diligent police officers would have asked Minor A how the phone account was created" and "Minor A told police that account was created by Sheehan," and concludes that Puricelli must have intentionally omitted that fact from the affidavit.  [D.Mot. at 7.] Speculation is not enough to meet the "clear and exacting standard" required by Franks, and the defendant has proffered no concrete reason to believe that a) Minor A actually made such a

---

[16] As set forth in footnote 2, the government adopts the defendant's naming convention for Minor B purposes of the litigation of this motion.

statement and b) Puricelli either intentionally or recklessly omitted that fact.  Furthermore, even if the defendant were able to make a substantial showing that such a statement existed, he would not be able to show that its inclusion was necessary to establish probable cause.[17]  Having failed to make a showing on either of the two elements, the defendant's motion on this ground is doomed. Owens, 917 F.3d at 38.

Finally, the defendant claims that if Puricelli had included a first-hand description of the purported Massachusetts State Police report in her affidavit, the clerk magistrate would have concluded that it "looks nothing like an actual Massachusetts State Police Report."  [D.Mot. at 8.] Apart from the fact that the defendant's argument is premised on pure speculation as to how the clerk might have judged the defendant's handiwork, this argument is fatally flawed in that it presumes that the civilians who were tricked into believing that the defendant had been "cleared" after an investigation—a ploy designed to divert suspicion from him in the case that any of his minor victims disclosed his bad behavior—would know what a "real" report would look like.  The defendant cannot establish a) what a "real" report "looks" like or b) whether the civilians involved would or should know what a "real" report "looks" like.  Thus any "omission" in that vein would be completely immaterial to the clerk magistrate's assessment of probable cause.  His motion on these grounds, again, fails.

The defendant has made no showing, let alone a substantial one, to necessitate a Franks hearing.  As such, the motion should be DENIED.

---

[17] See above at pages 14-15 for discussion of the sufficiency of the affidavit.

## CONCLUSION

For all of the foregoing reasons, the government respectfully requests that this Court DENY the defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrants and Motion for a <u>Franks</u> Hearing.

Respectfully Submitted,

ANDREW E. LELLING
United States Attorney

Date: July 24, 2019          By:     /s/ Anne Paruti
                                     Anne Paruti
                                     Assistant United States Attorney
                                     United States Attorney's Office
                                     One Courthouse Way
                                     Boston, MA 02210
                                     617-748-3310

* * * * * *

## <u>CERTIFICATE OF SERVICE</u>

I, Anne Paruti, hereby certify that the foregoing was filed through the Electronic Court filing system and will be sent electronically to the registered participants as identified on the Notice of Electronic filing:

Date: July 24, 2019               /s/ Anne Paruti
                                  Anne Paruti
                                  Assistant United States Attorney